# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION (DETROIT)

| | |
|---|---|
| In re: | Chapter 7 |
| Jeffrey Howard Brown, | Case No. 09-60375 |
| Debtor. | Hon. Phillip J. Shefferly |
| _____/ | |
| JGR Associates, LLC, Stoneleigh Development Corporation, Richard M. Lewiston, Jason P. Lewiston, Leslie Lewiston Etterbeek, and Daniel J. Smith, | Adversary Proceeding No. 09-05276-PJS |
| Plaintiffs, | |
| v. | |
| Jeffrey Howard Brown, | |
| Defendant. | |
| _____/ | |

## OPINION DISMISSING COMPLAINT AFTER TRIAL

### Introduction

Jeffrey Howard Brown is the Debtor in this bankruptcy case. The Plaintiffs brought this adversary proceeding against him seeking a determination of the non-dischargeability of debts alleged to be owed by the Debtor to them under §§ 523(a)(2)(A), (4), and (6) of the Bankruptcy Code. By stipulation of the parties, memorialized in the joint final pre-trial order (docket entry no. 102), the Plaintiffs are only requesting the Court to determine that the alleged debts are non-dischargeable, and are not requesting that the Court liquidate the amount of any alleged debts, which will be decided, if at all, in a pending arbitration proceeding between the Plaintiffs and the

Debtor. The trial in this adversary proceeding took place over five days, beginning on July 14, 2010 and concluding on August 19, 2010. During the trial, the Court heard live testimony from six separate witnesses, reviewed deposition testimony of one additional witness, and received into evidence joint exhibits 1 through 52, 58, 68, 70, 73 through 79, 81, 87, 89, 92 through 95, 98, 109, 110, 114, and 138 through 140. The Court has reviewed the joint final pretrial statement, the parties' trial briefs, and all of the testimony and exhibits admitted during the trial. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(a). After carefully reviewing and weighing all of the evidence in the record, the Court concludes that both of the Debtor's pending motions to dismiss must be denied, but that judgment should be entered in favor of the Debtor and against the Plaintiffs, because the Plaintiffs have failed to meet their burden to prove by a preponderance of the evidence that the debts alleged to be owed by the Debtor to the Plaintiffs are excepted from the Debtor's discharge under §§ 523(a)(2)(A), (4), or (6) of the Bankruptcy Code. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

### Facts

Jeffrey Howard Brown is a licensed attorney who is engaged in the real estate development business. Brown first became involved in that business when he went to work for Richard Lewiston ("Lewiston"), one of the Plaintiffs, in 1988. Lewiston, also an attorney, has been involved in the real estate development business since 1964. Lewiston has extensive real estate development experience in his career. Lewiston has built many residential projects, both single-family and multi-family. He has also been extensively involved in the acquisition and development of properties, and

the construction and management of income producing properties. Brown worked on many projects with Lewiston, and essentially learned the real estate development business from Lewiston. Brown eventually left his employment with Lewiston, but continued in the real estate development business. In 1996, Brown formed his own real estate management company, Brown Properties Corporation ("BPC"). Brown also has interests in various other real estate related business entities.

Beginning in the late 1990s, Brown became involved in the formation of four separate business entities, each of which was formed to develop a particular parcel of real estate. Brown invited Lewiston to participate in each of these entities. These four entities are central to the issues in this adversary proceeding.

Heron Ridge Associates, LLC ("Heron Ridge") was a multi-member limited liability company formed in 1997 for the purpose of developing 222.3 acres in Canton Township, Michigan. According to its operating agreement (Exhibit 2), there were six members in Heron Ridge. Neither Brown nor Lewiston individually were members of Heron Ridge, but each of them indirectly held an interest in it. One of the members of Heron Ridge was Stoneleigh Development Corporation ("Stoneleigh"), which held a 25% membership interest in Heron Ridge. Although the record is not entirely clear, it appears that Stoneleigh was owned by Lewiston, in combination with two of the other Plaintiffs in this adversary proceeding, Daniel Smith and Leslie Lewiston Etterbeek, and that Stoneleigh invested $425,000 in Heron Ridge. Brown's indirect interest in Heron Ridge is twofold. He held a 50% ownership in Canton Six Associates, LLC, which in turn held a 24% membership interest in Heron Ridge. Brown was also the sole owner of Wittlesey Associates, Inc. ("Wittlesey"), a corporation that was identified in the operating agreement as the managing member of Heron Ridge. Wittlesey also held a 1% interest in Heron Ridge.

Section 5.1 of the operating agreement for Heron Ridge stated that Heron Ridge would be "exclusively managed by the Managing Member," and provided that the managing member had the power to manage, control and make all decisions affecting the business and the assets of Heron Ridge "in the Managing Member's full and exclusive discretion," without the consent of the other members of Heron Ridge. However, section 5.2 of the operating agreement limited the managing member's powers by providing that certain actions required the unanimous consent of the other members, including entering into "a transaction involving an actual or potential conflict of interest between the Managing Member and/or a Member and the Company." Section 5.8(a) of the operating agreement provided that the managing member was entitled to receive a "developer's fee" of $2,000.00 per unit within the Heron Ridge development, to be paid to the managing member prior to any distribution of net cash proceeds to the members of Heron Ridge. Section 5.8(b) of the operating agreement provided that the managing member was also entitled to receive an "acreage fee" equal to 10% of the sales price for any sale of acreage by Heron Ridge, again paid prior to any distribution of net cash proceeds to members of Heron Ridge. Section 5.9 of the operating agreement stated that except for the developer's fee and acreage fee provided by section 5.8, the members would not receive compensation for rendering services to Heron Ridge "in their capacity as Members." However, that same section 5.9 also provided that the managing member would be reimbursed in full for "[a]ll reasonable expenses incurred . . . in connection with the operation of the Company's business . . . ." Section 5.10 of the operating agreement provided that the "Managing Member shall devote such time and effort as may be reasonably required to conduct the [ ] business" of Heron Ridge. Heron Ridge developed and sold home sites for a number of years. According to

-4-

its federal income tax returns from 1997 through 2007 (Exhibit 24), Heron Ridge had aggregate sales of over $15 million during those years.

The second of the four development entities was Tremont Park Associates, LLC ("Tremont Park"), a limited liability company formed in 1998 to develop 188 home sites in Ypsilanti Township, Michigan. According to the operating agreement (Exhibit 3), neither Lewiston nor Brown individually held an interest in Tremont Park. However, like Heron Ridge, both Lewiston and Brown indirectly held substantial interests in Tremont Park through other entities that they owned. JGR Associates, LLC ("JGR"), a limited liability company, and also one of the Plaintiffs, is shown in the operating agreement as holding a 50% interest in Tremont Park. The record is again somewhat unclear, but JGR appears to have been owned by Lewiston, together with his son, Jason Lewiston, another Plaintiff, and certain other individuals that are not parties to this lawsuit. JGR invested approximately $1,250,000.00 in Tremont Park. Martz Road Associates, LLC ("Martz Road") is shown as holding a 49% interest. Martz Road was owned entirely by Brown. Like Heron Ridge, Wittlesey was the managing partner for Tremont Park, and held a 1% interest in it.

Tremont Park's operating agreement is similar to Heron Ridge's operating agreement. Tremont Park's operating agreement did not provide for a fee for the managing member, but did provide in section 5.9 that the managing member would be reimbursed for "[a]ll reasonable expenses incurred . . . in connection with the operation of the Company's business." Like Heron Ridge's operating agreement, section 5.10 of Tremont Park's operating agreement also required the managing member to "devote such time and effort as may be reasonably required to conduct the business" of Tremont Park. There was one significant difference between the two operating agreements – Tremont Park did not provide for a developer's fee or an acreage fee. Tremont Park

developed and sold home sites for a number of years. According to its federal income tax returns for the years 1998 through 2007 (Exhibit 26), Tremont Park had sales during those years in excess of $8.5 million.

The third of the four entities was Wellesley Building Company, LLC ("Wellesley Building"), formed in 2000 to develop land in Pittsfield Township, Michigan. The development consisted of 209 units in phase 1, construction management for 217 units in phase 2, and the completion of 206 units of vertical construction. According to Wellesley Building's operating agreement (Exhibit 1), its members were Brown, Lewiston, Jason Lewiston, and Wellesley Equities, Inc. ("Wellesley Equities"). Wellesley Equities was a corporation owned by Brown and Jason Lewiston, and was also identified in the operating agreement as the managing member of Wellesley Building. According to the operating agreement, Brown owned 49% of Wellesley Building, Jason Lewiston owned 49%, Lewiston owned 1%, and Wellesley Equities owned 1%. Lewiston invested $300,000.00 in Wellesley Building and also signed personal guaranties for loans made to it. Wellesley Building developed, built and sold homes for a number of years. The federal income tax returns for Wellesley Building for the years 2000 through 2007 (Exhibit 22) show that it had sales of over $41 million during those years.

The fourth and last entity was Cherry Hill/Denton Group, LLC ("Cherry Hill/Denton"), formed in 2002 to develop 126 units in Canton Township, Michigan, and to perform the vertical construction of another 60 units in Canton Township. According to its operating agreement (Exhibit 4), there were three members of Cherry Hill/Denton. The managing member of Cherry Hill/Denton was J&J Management of Michigan, Inc. ("J&J"), a corporation owned by Brown and Jason Lewiston. According to the operating agreement, Brown owned 49.5% of Cherry Hill/Denton,

-6-

Jason Lewiston owned 49.5%, and J&J owned 1%. The operating agreement does not identify Lewiston as a member of Cherry Hill/Denton, but Lewiston did sign a personal guaranty for certain loans that were made to it. The operating agreement for Cherry Hill/Denton was similar to the operating agreements for the other entities. Like Tremont Park and Wellesley Building, it did not provide for the developer's fee or acreage fee that were included in the Heron Ridge operating agreement. Cherry Hill/Denton developed, built and sold home sites for a number of years. According to its federal income tax returns for Cherry Hill/Denton for the years 2002 through 2007 (Exhibit 28), Cherry Hill/Denton had sales in excess of $11.5 million during those years.

Although Wittlesey was named as the managing member for both Heron Ridge and Tremont Park, Brown himself effectively functioned as the managing member of both of those entities. Similarly, although J&J was named as the managing member of Cherry Hill/Denton, and Wellesley Equities was named as the managing member of Wellesley Building, Brown functioned as the managing member of these two entities as well, even though both of the managing members were jointly owned by Brown and Jason Lewiston. Jason Lewiston was apparently somewhat involved in the management of Cherry Hill/Denton and Wellesley Equities through 2002, although his precise role was not explained to the Court. After that, for reasons that also are not clear from the record, Jason Lewiston ceased his involvement in their management. Therefore, even though Brown individually was not named as the managing member for Heron Ridge, Tremont Park, Cherry Hill/Denton or Wellesley Building, he acted at all times relevant to this lawsuit as the managing member of all four of those entities (collectively referred to sometimes as the "Four Entities"). The Plaintiffs knew that Brown was acting as the managing member of the Four Entities and did not object.

After the formation of the Four Entities, Brown essentially worked full time as the managing member for them. Although BPC, Brown's management company, was providing various services to approximately 20 different entities, the Four Entities accounted for substantially all of BPC's revenue. Brown did not keep track of his hours or the services that he provided as the managing member for the Four Entities, but they were substantial. Brown made calls, attended meetings, inspections, and sales closings, identified parcels of land, negotiated and structured purchase agreements, dealt with zoning, utilities and legal issues, obtained necessary municipal approvals, hired contractors, spent time daily at the construction sites, dealt with homeowners, handled homeowners' complaints, negotiated with builders on lot sales, and drafted sales documents.

Brown believed that he had tremendous latitude as the managing member of each of the Four Entities in how they were managed, that it was permissible for him to incur expenses and provide services to the Four Entities through BPC, and that, as the managing member, he was entitled to be compensated for all of his time, effort and labor, devoted to the management of the Four Entities. Although he was working essentially full time for the Four Entities, neither Brown nor BPC entered into a written contract with the Four Entities to provide services to them, nor did Brown draw a regular salary either from the Four Entities or from BPC. Instead, Brown took substantial sums out of each of the Four Entities in a myriad of ways that were booked variously as loans, reimbursement of expenses and management fees.

From 2001 through 2007, over $8.6 million was booked by the Four Entities as loans, reimbursement of expenses or management fees in one way, shape or form to Brown or BPC, excluding the developer's fee and acreage fee required to be paid to Wittlesey under the Heron Ridge operating agreement. Many of the payments booked as loans consisted of loans from the

Four Entities to one or more entities owned or controlled by Brown that had no business or other relationship with the Four Entities. For example, there were substantial loans shown as being made by the Four Entities to Bunton Martz Associates, Monument Preserve Association, Icehouse 220, LLC, and Viking Lodge, LLC, all entities owned by Brown and having no relationship with the Four Entities. Icehouse 220 and Viking Lodge were entities formed by Brown to purchase two condominiums in Telluride, Colorado, for his and his family's personal use.

There were also substantial payments of expenses of BPC that were initially recorded as loans from the Four Entities to BPC. Many of those payments were for personal expenses of Brown and his family. For example, Exhibit 58 includes a series of American Express bills for BPC. Any given month shows a large portion of the charges were for family shopping, dining and travel. There were substantial purchases for home furnishings and art. In one six-month period, Brown and his family charged $63,000 for apparel. There were almost monthly trips, sometimes two or three per month. Telluride was a frequent destination, as well as Florida, San Juan, North Carolina, and New York City. A trip to Europe was sandwiched between domestic trips as well. Even in the last part of 2006, when the downturn in the real estate market was evident, Brown managed six trips in three months, to Arizona, North Carolina and Colorado. There were also significant payments of personal expenses of Brown and his family members that were recorded as loans from the Four Entities directly to Brown and his family. Finally, there were substantial payments recorded as management fees. From 2001 through 2007, the actual amount of cash paid by the Four Entities to Brown or BPC as reimbursement of expenses, loans or management fees, either directly or indirectly, was just over $7.4 million.

During the time that he acted as the managing member for the Four Entities, Brown maintained the books and records for each of them in his office. Employees of BPC, including Harry Pianko, its controller, recorded all of the transactions for the Four Entities using Quickbooks accounting software. The dates, amounts, payees, and types of payments were all identified and recorded in the Quickbooks files for each of the Four Entities. BPC also had its own Quickbooks file for its transactions in which it recorded the dates, amounts, payees and types of payments that it made.

The accounting firm for the Four Entities and for BPC throughout all of the years relevant to this lawsuit, was Tama & Budaj, P.C., later known as Tama, Budaj & Raab, P.C. Ely Tama was Lewiston's long-time accountant who prepared tax returns for Lewiston and for many entities associated with Lewiston. Brown hired Tama's accounting firm to prepare tax returns for himself, the Four Entities and for BPC. Tama's firm prepared tax returns for the Four Entities and BPC for the years 2000 through 2006 based upon information provided by Brown and Pianko, including the Quickbooks records for the Four Entities and BPC, and made adjusting journal entries as needed, but Tama's firm did not perform an audit, review or compilation for any of the Four Entities or for BPC (Exhibit 33). Nor did Tama's firm determine whether BPC was entitled to take any management fees, reimbursement of expenses, loans or other amounts, or whether any of the amounts taken by Brown or BPC were reasonable. However, Tama was aware that management fees, reimbursement of expenses, loans and other amounts were being taken by Brown and BPC from the Four Entities. Tama did not consider that to be uncommon and did not indicate to Brown that it was inappropriate to take those amounts (Exhibit 34). During the years that Brown acted as managing member for the Four Entities, Brown and Pianko met frequently with Tama and other staff

-10-

accountants at Tama's accounting firm. When Tama's firm had any questions about the information it was receiving from Brown or Pianko, either because of something that appeared inconsistent or inappropriate, Tama's firm asked Brown or Pianko for information. There was never an instance where they did not receive the information they requested.

Beginning when the Four Entities were formed, and continuing through 2007, Lewiston was not involved in the day-to-day operations of the Four Entities. Also, once the Four Entities were formed, Lewiston and Brown had little direct business or social contact with each other, although they occasionally met at political events. Lewiston did receive some information about the business of the Four Entities from his son, Jason Lewiston, but Brown was Lewiston's primary source of information about the Four Entities. Brown regularly sent memoranda (Exhibit 70) to the members of the Four Entities from 2001 to 2007 with information pertaining to their sales progress, profit potential, profits made and capital status. In addition to receiving those memoranda, each of the members of the Four Entities annually received a K-1 for each of the Four Entities. The K-1s informed the members of their respective shares of income for the previous year. However, the K-1s did not indicate what payments had been made by the Four Entities to Brown or any of his companies, whether as loans, reimbursement of expenses or management fees. Lewiston turned his K-1s over to Tama, and then met with Tama at income tax time each year in connection with the preparation of his personal income tax returns and returns for other entities in which he had an interest. Although he received a K-1 for each of the Four Entities for each of the years 2001 through 2007, Lewiston did not inquire further of Tama regarding any of the details to support the shares of net income that were shown for him on his K-1s during these years. Nor did he ask for a copy of the complete tax returns for the Four Entities from 2000 through 2006, or any other financial

-11-

information concerning them, although it appears that the tax returns for some of the Four Entities were sent by those entities to their members for at least some of those years (Exhibit 87).

After their formation, some of the Four Entities made distributions to their members, but others did not. For example, Heron Ridge made substantial distributions, including approximately $2 million to Lewiston. Similarly, Tremont Park made distributions to members, although in a much smaller amount. According to Lewiston, he received a total of $300,000. Wellesley Building and Cherry Hill/Denton did not make any distributions to their members. At some point, perhaps as early as late 2005, but in any event continuing thereafter, the residential real estate market began deteriorating. In late 2006, Brown began the process of conducting an "overall accounting" for the years 2001 through 2006, to determine whether the money he had received in various forms from the Four Entities was commensurate with the value of the services he had rendered and the expenses he had incurred as the managing member of the Four Entities during those years. In early 2007, journal entries were made in the Quickbooks files for each of the Four Entities to show that the loans that had previously been made to Brown, his family and Brown related entities, were assumed by BPC, effective as of December 31, 2006. Another journal entry was then made to reclassify these loans as management fees owed to BPC for Brown's services. These journal entries and the reclassification occurred after Brown met with Tama, Pianko and other members of Tama's accounting firm (Exhibit 50). Brown and Pianko provided Tama with schedules of amounts of management fees that Brown believed he was entitled to receive. Tama's firm then made the journal entries based upon that information. Brown discussed the details of these journal entries and the reclassification of these amounts to management fees with Tama and members of Tama's firm, but not with Lewiston.

In early 2007, Lewiston received a memorandum from Brown dated February 6, 2007 (Exhibit 70), that was different in tone and content from the previous memoranda he had received regarding the Four Entities. Unlike the optimism of the other memoranda that he had been receiving for years, the February 6, 2007 memorandum indicated for the first time that there were problems with the Four Entities. This memorandum explained that enormous amounts of capital were now needed because there were bank loans in distress, unpaid bills for taxes and trade creditors, and projected cash shortfalls in the future. When Lewiston received this memorandum, he began for the first time to ask questions about the financial condition of the Four Entities. In his words, Lewiston met with Tama to ask him "where all of the money had gone" from the Four Entities. According to Lewiston, he learned for the first time from Tama that substantial sums had been paid out of the Four Entities over the years to Brown or BPC as loans, reimbursement of expenses and management fees. Lewiston testified that prior to that meeting in 2007, he had no knowledge that Brown had been taking any loans, reimbursement of expenses or management fees from any of the Four Entities.

Lewiston then hired a consultant, Jay Turner, to review the financial condition of the Four Entities. Turner met with Brown to request information concerning the expenditures that had been made by the Four Entities, including all payments, either directly or indirectly, made to Brown, and to obtain other information concerning the financial condition of the Four Entities. Lewiston met with Turner on numerous occasions to discuss each of the areas that Turner was examining concerning the Four Entities. Turner did not provide Lewiston with a written report of his findings. However, Turner did prepare a memorandum dated June 12, 2007 (Exhibit 78), summarizing his notes from the meetings he had with Brown. The memorandum reviewed detailed information

-13-

concerning each of the Four Entities, including schedules of capital contributions, debts, lines of credit, job costs, land development costs and operating expenses. The memorandum also summarized Turner's discussions with Brown concerning the overhead and fees taken by Brown and by Brown related entities. The memorandum explained how Brown had allocated fees and overhead to each of the projects of the Four Entities "for services performed." The memorandum described Brown as helpful in providing information to enable Turner to understand the expenditures that had been made and to understand the financial condition of the Four Entities. The memorandum noted that Brown acknowledged to Turner that Brown could have been "more aggressive about reducing overhead, but like many others, he underestimated the severity of this economic downturn."

By June, 2007, the relationship between Lewiston and Brown had completely ruptured. Lewiston's attorneys were now sending letters indicating Lewiston's desire to take over management of the Four Entities (Exhibits 94 and 95). In August, 2007, Brown ceased functioning as the managing member for any of the Four Entities. He then moved with his family to Las Vegas, Nevada. On August 15, 2007, JGR filed suit in the Oakland County Circuit Court for the State of Michigan against Brown and two of his companies, Wittlesey and Martz Road. Lewiston, Jason Lewiston, Leslie Lewiston Etterbeek, Daniel Smith and Stoneleigh filed a second lawsuit in Oakland County Circuit Court against Brown and BPC. A third lawsuit was filed by Lewiston and Jason Lewiston against Brown and BPC. On April 14, 2008, the Oakland County Circuit Court ordered the parties to arbitrate. There were many motions, responses and other papers filed in the Oakland County Circuit Court litigation (Exhibits 46 through 48). On August 5, 2008, the arbitrator issued a partial summary judgment against Wittlesey for $329,000.00. The arbitrator then conducted evidentiary hearings beginning in February, 2009 and continuing in May, 2009. During those

hearings, the arbitrator issued another partial summary judgment against Brown in the amount of $1,791,027.33. On May 20, 2009, Brown filed a Chapter 7 bankruptcy case, which stayed the arbitration proceeding.

On July 1, 2009, JGR, Stoneleigh, Lewiston, Jason Lewiston, Leslie Lewiston Etterbeek, and Daniel J. Smith filed this adversary proceeding against Brown. None of the Four Entities are plaintiffs or parties in this adversary proceeding. On July 7, 2010, the Court conducted the final pretrial conference and entered the joint final pretrial order. At the conclusion of his opening statement at the trial on July 14, 2010, Brown made an oral motion to dismiss this adversary proceeding, asserting that the Plaintiffs were not the proper parties to bring this adversary proceeding and, therefore, requested the Court to dismiss it for "lack of standing." The Court informed Brown that it would not consider Brown's request for dismissal based only on an oral motion, and instead ordered that Brown must make such motion, if at all, in writing, accompanied by a memorandum of law, so that the Plaintiffs could respond to it in writing. After the third day of trial on July 16, 2010, the Court conferred with the parties regarding the scheduling of further trial dates and then scheduled further proceedings for August 18 and 19, 2010. Because there was a gap in the time before the trial would resume, the Court fixed a date for Brown to file the written motion to dismiss, accompanied by a brief, and set a schedule for the Plaintiffs to reply to it so that the issues would be fully briefed and properly joined before the Court. On July 26, 2010, Brown filed a motion to dismiss, accompanied by a memorandum of law (docket entry no. 120). On August 4, 2010, the Plaintiffs filed a memorandum of law in support of their response to Brown's motion to dismiss (docket entry no. 124). On August 9, 2010, Brown filed a reply to the Plaintiffs' response to the motion to dismiss the adversary proceeding (docket entry no. 128). When the trial resumed

on August 18, 2010, the Court informed the parties that it would take Brown's motion to dismiss under advisement and would decide it at the conclusion of the trial.

In addition to Brown's motion to dismiss, the Court has one other motion under advisement in this adversary proceeding. At the close of the Plaintiffs' proofs, Brown made an oral motion to dismiss because of the failure of the Plaintiffs to introduce any evidence into the record with respect to the essential elements of a non-dischargeability action under §§ 523(a)(2)(A), (4), and (6) of the Bankruptcy Code. The Court took that motion under advisement. When the trial concluded on August 19, 2010, because of the voluminous exhibits that the parties stipulated to introduce into evidence, many of which were not referred to by the parties at all during the trial, the Court permitted the parties to each file a list identifying for the Court the relevant portions of each of the exhibits introduced into evidence to assist the Court in reviewing the exhibits. The Plaintiffs and Brown did that. This opinion will first address Brown's motion to dismiss for lack of standing, next address Brown's oral motion at the close of the Plaintiffs' proofs, and then turn to the merits of the Plaintiffs' case.

## Brown's Motion to Dismiss for Lack of Standing

Brown's motion alleges that the Plaintiffs "lack standing" and "are not the real parties in interest." Essentially, Brown argues that any injury that occurred as a result of Brown's conduct was suffered by the Four Entities, and not by the individual members of those entities, or the members of the members. The Plaintiffs' relationships to the Four Entities can be summarized as follows: Lewiston is (i) a shareholder of Stoneleigh, which is a member of Heron Ridge; (ii) a member of JGR, which is a member of Tremont Park; (iii) a member of Wellesley Building and a guarantor of certain of its debts; and (iv) a guarantor of certain of the debts of Cherry Hill/Denton. Lewiston's

son, Jason Lewiston, is (i) a member of JGR, which is a member of Tremont Park; (ii) a member of Wellesley Building; (iii) a shareholder of Wellesley Equities, the managing member of Wellesley Building; (iv) a member of Cherry Hill/Denton; and (v) a shareholder of J&J, the managing member of Cherry Hill/Denton. Leslie Lewiston Etterbeek and Daniel J. Smith are each members of Stoneleigh, a member of Heron Ridge. JGR is a member of Tremont Park. Therefore, Brown is correct in noting that none of the Four Entities are plaintiffs in this adversary proceeding, and that the only plaintiffs are instead either members of the Four Entities, or have some interest in members of the Four Entities.

The Plaintiffs argue that Brown's motion to dismiss is untimely, and that Brown has therefore waived any challenge to whether the Plaintiffs are the real parties in interest. Brown responds that his motion challenges the Court's subject matter jurisdiction, which cannot be waived and may be raised at any time. Therefore, Brown argues that his motion to dismiss is not untimely, even though he did not make his oral motion until the first day of trial, and did not file his written motion until July 26, 2010.

Both Brown's motion and the Plaintiffs' response use various legal concepts interchangeably, especially "standing" and "real parties in interest," without clearly delineating the distinctions among these concepts. There are three separate, potentially relevant concepts: (1) capacity to sue, (2) Article III standing (constitutional standing), and (3) real party in interest (prudential standing). Brown was clear in arguing that capacity to sue is not the basis for his motion to dismiss. Brown concedes that he had previously raised this issue in the Oakland County Circuit Court litigation, where the court ruled that the Plaintiffs did not lack the legal capacity to sue.

-17-

As to the two other potential grounds for Brown's motion, "there is a distinction between questions of Article III standing and Rule 17(a) real party in interest objections." Zurich Ins. Co. v. Logitrans, Inc., 297 F.3d 528, 532 (6th Cir. 2002). "Even if a plaintiff has Article III standing, prudential considerations may limit a plaintiff's ability to invoke federal jurisdiction." Lee v. Deloitte & Touche LLP, 428 F. Supp. 2d 825, 830 (N.D. Ill. 2006) (citing Warth v. Seldin, 422 U.S. 490, 499-500 (1975)). In other words, "[b]ecause these prudential principles are 'limits' on standing, they do not themselves create jurisdiction; they exist only to remove jurisdiction where the Article III standing requirements are otherwise satisfied." Am. Civil Liberties Union v. Nat'l Sec. Agency, 493 F.3d 644, 677 (6th Cir. 2007). The distinction is important because "[t]he lack of subject matter jurisdiction is a nonwaivable defect that may be raised at any time to justify dismissal of a pending action." Ambrose v. Welch, 729 F.2d 1084, 1085 (6th Cir. 1984) (citation omitted); Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)) ("'[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'"). In contrast, "[o]bjections to standing based upon prudential considerations are waived if not timely raised." Lee v. Deloitte & Touche LLP, 428 F. Supp. 2d 825, 831 (N.D. Ill. 2006) (citations omitted).

At first blush, Brown's motion gives the impression that he is challenging the Plaintiffs' constitutional standing. This is because Brown cites case law on the three familiar requirements necessary to show Article III standing, and quotes language that concerns non-waivable subject-matter jurisdiction. However, a closer reading of Brown's motion and brief reveals that the substance of Brown's objection is that the Plaintiffs are not the real parties in interest, because any cause of action against Brown belongs to the Four Entities and not to the Plaintiffs. Despite repeated

claims that the Plaintiffs lack "standing," Brown does not actually assert that the Plaintiffs' have failed to demonstrate constitutional Article III standing but, instead, challenges whether the Plaintiffs are the real parties in interest. That challenge is rooted in the distinctly separate concept of prudential standing. Viewed as a challenge to prudential standing, Brown's argument is that the money allegedly taken from the Four Entities is the actual injury on which the complaint is based. Because the funds that were taken belonged to the Four Entities, Brown concludes that the Four Entities are the real parties in interest, and not the Plaintiffs.

Contrary to Brown's assertion that Michigan law controls, because the substance of Brown's objection is that the Plaintiffs are not the real parties in interest, the "question is resolved in this case by federal law." Rawoof v. Texor Petroleum Co., Inc., 521 F.3d 750, 756 (7th Cir. 2008) (citation omitted). "This case states a federal claim, and federal rules of procedure and standing obviously govern." Id. Real party in interest objections in the federal system generally arise in conjunction with Rule 17(a), incorporated by Fed. R. Bankr. P. 7017, which permits substitution of the real party in interest once an objection has been made. Whelan v. Abell, 953 F.2d 663 (D.C. Cir. 1992). However, that rule does not fix a deadline to make such an objection. In Whelan, similar to this case, the issue was whether the cause of action should be brought by the corporation or the principals. Whelan, 953 F.2d at 672. The court in that case found that while Rule 12(h)(2)(C) permits a Rule 12(b)(6) motion to be raised at trial, the text of Rule 17 "implies that the defense may *not* be raised at any time[.]" Id. (emphasis in original). The court in Whelan held that in the face of a real party in interest objection made on the first day of trial, "judges abuse their discretion in allowing the plea as late as the start of the trial if the real party had been prejudiced by the defendant's laxness." Id. at 672 (citations omitted). See also In re Signal Int'l, LLC, 579 F.3d 478,

-19-

489 (5th Cir. 2009) (ruling that the "district court did not abuse its discretion in holding that [the petitioner] waived the defense by failing to timely object" because the petitioner "did not challenge [the respondent's] status as the real party in interest until the eve of trial"); Bd. of Educ. of Oak Park and River Forest High School Dist. No. 200 v. Kelly E., 207 F.3d 931, 934 (7th Cir. 2000) (holding "that prudential considerations in general . . . are forfeited if not presented in a timely fashion"); United HealthCare Corp. v. Am. Trade Ins. Co., Ltd., 88 F.3d 563, 569 (8th Cir. 1996) (where objection came one week prior to trial, the defendant "waived his real party in interest defense by failing to raise it in a timely fashion" and noting this was the "general rule"); Hefley v. Jones, 687 F.2d 1383, 1388 (10th Cir. 1982) ("The real party in interest defense is for the benefit of a defendant and should be raised in timely fashion or it may be deemed waived.") (citation and quotes omitted); Zurich Ins. Co. v. Logitrans, Inc., 297 F.3d 528, 535 (6th Cir. 2002) (concurring opinion) (commenting that the waiver argument "has merit" even though the court found that Article III standing was lacking, thus it lacked subject matter jurisdiction to reach the main argument on appeal that the real party in interest objection was waived).

A careful review of Brown's motion, brief and oral argument on his motion to dismiss, demonstrates that Brown is objecting to the Plaintiffs' status as real parties in interest. Neither capacity to sue nor Article III standing are implicated here, notwithstanding the Plaintiffs' multiple references to capacity and Brown's generalized assertion that his motion concerns the jurisdictional barrier of constitutional standing. Brown's motion to dismiss only challenges whether the Plaintiffs are the real parties in interest. As the persuasive authorities cited above hold, real party in interest objections must be timely raised or are waived. Having raised this issue on the first day of trial, long

-20-

after the deadline to file dispositive motions had passed, Brown's motion is untimely and Brown's objection is thus waived. Brown's motion to dismiss is therefore denied.

### **Brown's Oral Motion to Dismiss at the Close of the Plaintiffs' Proofs**

Brown orally moved at the close of the Plaintiffs' case in chief for judgment as a matter of law. Fed. R. Bankr. P. 9015 incorporates Fed. R. Civ. P. 50. "Judgment as a matter of law is appropriate where 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" Keeton v. Flying J, Inc., 429 F.3d 259, 262 (6th Cir. 2005) (quoting Fed. R. Civ. P. 50(a)(1)). "[T]he initial determination is whether the evidence is sufficient to create an issue of fact for the jury." Littlejohn v. Rose, 768 F.2d 765, 770 (6th Cir. 1985) (citation omitted). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party." Demcyzk v. Lesh, Casner & Miller, L.P.A. (In re Kirkpatrick), 254 B.R. 378, 383 (N.D. Ohio 2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

After reviewing the extensive record made in the trial of this adversary proceeding, the Court concludes that Brown's oral motion to dismiss made at the close of the Plaintiffs' proofs must be denied. The Plaintiffs introduced sufficient evidence with respect to each of their three counts to create issues of fact for the trier of fact. The Court cannot find that there is no legally sufficient evidentiary basis for the Plaintiffs' complaint. Instead, the Court must weigh all of the evidence to determine whether the Plaintiffs have proven their case. Therefore, Brown's oral motion to dismiss is denied.

## Burden of Proof

In considering the extensive evidentiary record in this trial, it is important to bear in mind the applicable burden of proof standard for adversary proceedings of this kind. "[T]he standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991); <u>Rembert v. AT&T Universal Card Services, Inc.</u> (<u>In re Rembert</u>), 141 F.3d 277, 281 (6th Cir. 1998). "In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence. Further, exceptions to discharge are to be strictly construed against the creditor." <u>In re Rembert</u>, 141 F.3d at 281 (citing in part <u>Grogan v. Garner</u>, 498 U.S. at 291) (other citation omitted).

## Section 523(a)(2)(A)

The Plaintiffs first assert that the debts alleged to be owed to them by Brown are non-dischargeable under § 523(a)(2)(A) of the Bankruptcy Code. Section 523(a)(2)(A) of the Bankruptcy Code is written in the disjunctive. It describes three types of conduct that can give rise to a non-dischargeable debt: (1) false pretenses; (2) a false representation; and (3) actual fraud. The Plaintiffs argue that the debts they claim are owed to them by Brown are non-dischargeable under § 523(a)(2)(A) of the Bankruptcy Code because of "actual fraud." The elements of actual fraud are slightly different from those needed to prove a false representation, which is the basis for many § 523(a)(2)(A) cases. <u>See</u>, <u>e.g.</u>, <u>In re Rembert</u>, 141 F.3d 277 (6th Cir. 1998).

Actual fraud entails a course of conduct intended to deceive, justifiable reliance, and proximate cause. <u>See</u> <u>Field v. Mans</u>, 516 U.S. 59, 69 (1995) ("The operative terms in § 523(a)(2)(A), . . . 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art. They are common-law terms, and . . . in the case of 'actual fraud,' which

-22-

concerns us here, they imply elements that the common law has defined them to include.") (citations omitted)); WebMD Practice Services, Inc. v. Sedlacek (In re Sedlacek), 327 B.R. 872, 887 (Bankr. E.D. Tenn. 2005) (citing in part In re Rembert, 141 F.3d at 280) (other citation omitted). In Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001), the Bankruptcy Appellate Panel adopted the position of the Seventh Circuit Court of Appeals in McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000) that "actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions." In Vitanovich, the court explained that

> [i]n McClellan, the Court of Appeals . . . stated that "section 523(a)(2)(A) is not limited to 'fraudulent misrepresentation.' [B]y distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation." McClellan acknowledges that many cases have assumed "that 'actual fraud' involves a misrepresentation." However, such a restricted definition is not required, as actual fraud encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another."

In re Vitanovich, 259 B.R. at 877 (quoting McClellan v. Cantrell, 217 F.3d at 893); see also Morganroth & Morganroth, PLLC v. Stollman (In re Stollman), 404 B.R. 244, 257-58 (Bankr. E.D. Mich. 2009). The Vitanovich court held that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." 259 B.R. at 877. "Fraudulent intent may be inferred by examining the Debtor's conduct to determine if he presented the Plaintiff with a picture of deceptive conduct, indicating an intent to deceive." In re Sedlacek, 327 B.R. at 887-88 (alterations, internal quotation marks and citations omitted).

Unlike § 523(a)(2)(B) of the Bankruptcy Code, which requires reasonable reliance, proving a non-dischargeable debt based upon actual fraud under § 523(a)(2)(A) requires a showing of

justifiable reliance. <u>Field v. Mans</u>, 516 U.S. at 74-75. Justifiable reliance means that a plaintiff "is required to make an investigation of his own" "where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived . . . ." <u>Id.</u> at 71 (internal quotation marks and citation omitted).

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of a reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.

<u>Id.</u> at 70-71 (internal quotation marks and citation omitted).

The final element to prevail under the actual fraud exception contained in § 523(a)(2)(A) of the Bankruptcy Code is proof that the Plaintiffs' reliance "was the proximate cause of [their] losses . . . ." <u>In re Sedlacek</u>, 327 B.R. at 888. "There must be a direct link between the alleged fraud and the creation of the debt." <u>Id.</u> (alterations, internal quotation marks and citations omitted).

Much of the Plaintiffs' proofs at trial focused on proving the first element of § 523(a)(2)(A), intentionally deceptive conduct. The Plaintiffs argue that there was not a single representation or act by Brown that makes up the fraud in this case, but rather that the fraud occurred as a result of various circumstances and conduct of Brown over a period of time. Because the Plaintiffs' case does not depend upon a single representation or act, it is necessary to review all of the evidence that the Plaintiffs adduced regarding the various circumstances of this case to determine if Brown perpetrated a fraud upon the Plaintiffs. In presenting their case for actual fraud, the Plaintiffs emphasized the substantial amount of money taken, the manner in which Brown caused the transfers

of the funds, the classification and reclassification of the amounts taken, the concealment of Brown's

actions, and that the Plaintiffs had no knowledge of what Brown was doing.

First, the Plaintiffs contend that Brown was not entitled to *any* payments, much less the

enormous amount that he ended up receiving. They point to the terms of the operating agreements

for the Four Entities. Although the Plaintiffs note that none of the operating agreements for the Four

Entities was ever amended to identify Brown individually as the managing member, they do not

claim that they did not know that Brown was acting as the managing member of each of the Four

Entities. Nor do they contend that they ever expressed any objection to Brown individually serving

as the managing member of each of the Four Entities. Instead, they claim that the operating

agreements for the Four Entities do not provide for the payment of any fee to the managing member

of the Four Entities for management of the Four Entities. Only the operating agreement for Heron

Ridge provided for fees, and those were limited to a developer's fee and and acreage fee. Lewiston

insisted in his testimony that he never agreed, either in writing or orally, that Brown would be paid

management fees out of the Four Entities. However, Lewiston conceded that he also understood that

the operating agreements for the Four Entities did not expressly prohibit the payment of

management fees and that the operating agreements did expressly provide for the managing member

to be reimbursed for reasonable expenses incurred in the management of the Four Entities.

The Plaintiffs adduced uncontroverted evidence that shows very large sums of money going

from the Four Entities, directly and indirectly, to Brown. Michael N. Kahaian testified as an expert

witness. Kahaian is presently a director at Stout Risius Ross, a professional financial advisory

services firm. Kahaian has extensive experience in the financial services industry. He is a certified

public accountant accredited in business valuation, a certified fraud examiner, certified in financial

forensics, and a certified valuation analyst. Kahaian testified that he was retained to analyze certain financial information during the arbitration proceedings between the Plaintiffs and Brown before Brown filed his Chapter 7 petition. Kahaian prepared a report on December 16, 2009 (Exhibit 138) and a powerpoint presentation (Exhibit 139) that analyzed the flow of funds from the Four Entities, either directly or indirectly, to Brown, BPC, and other Brown related persons or entities for the period January 1, 2001 through December 31, 2007.

Kahaian's testimony at trial and his written materials demonstrate that from 2001 through 2007 the records of the Four Entities show loans, reimbursement of expenses and management fees paid out by the Four Entities in one way, shape or form to Brown and BPC that total $8,621,454.43, excluding the developer's fee and acreage fee paid by Heron Ridge to Wittlesey. Kahaian's testimony and reports also establish that the total cash actually received by Brown and BPC from the Four Entities during this time period was $7,416,018.77.

Kahaian traced in great detail the funds that were taken out of the Four Entities and paid over directly or indirectly to Brown, BPC or other Brown related entities. Kahaian's testimony at trial and his written reports identified the amounts taken out, the dates they were taken out, and what the funds were used for. Kahaian also testified to a detailed analysis of all of the receipts of BPC during the years in question, and showed how BPC spent its money during those years. According to Kahaian, from 2001 to 2007, BPC's records show that BPC paid a total of $4,249,876.64 of operating expenses. Further, Kahaian concluded that over $2.4 million of those expenses did not relate to any of the projects of the Four Entities. But even if all $4.2 million of expenses could be attributed to the Four Entities, that still left over $3.1 million of BPC's revenues unaccounted for.

-26-

Kahaian referred to this $3.1 million as the "profits" or "net income" received by BPC from the cash taken out of the Four Entities by Brown.

The evidence overwhelmingly demonstrates that Brown took very large sums from the Four Entities.

The Plaintiffs next argue that, aside from the magnitude of the sums taken by Brown, the circumstances of the various ways that Brown took the funds out of the Four Entities give rise to an inference of fraud. Starting with the operating agreements of the Four Entities, the Plaintiffs point to a provision in each that requires unanimous consent of all members for a transaction between the managing member and another member. The Plaintiffs believe that Brown's use of BPC, his management company, as a conduit to take funds from the Four Entities represented a conflict of interest, for which Brown did not obtain unanimous consent. Further, Brown brought in BPC without a written contract. Even the fact that Brown himself, rather than the named entities, Wittlesley, Wellesley Equities and J&J, acted as the managing member was not reflected in any amendment to the operating agreements. Although recognizing that a breach of the operating agreements alone cannot form the basis of a non-dischargeability action, the Plaintiffs believe that these multiple breaches do tend to evidence fraudulent conduct.

As to the specific methods in which Brown took money out of the Four Entities, Kahaian's testimony at trial and his written reports describe four basic ways. First, Kahaian traced the monies paid directly to BPC by the Four Entities that were recorded as management fees. Kahaian testified that the sums recorded as management fees were later reclassified by Brown to costs of goods sold for the Four Entities. Kahaian explained the second method of taking funds through loans that the Four Entities made to Brown or Brown-related entities in which the Plaintiffs had no interest.

-27-

Kahaian explained how these loans were subsequently assumed by BPC and reclassified as management fees. Kahaian next explained how payments of expenses of BPC directly by Wellesley Building were originally recorded as loans to BPC, and then later reclassified as management fees. Finally, Kahaian explained that a fourth method of taking funds consisted of payments of personal expenses of Brown and his family members directly by BPC that were originally classified as loans to Brown and his family, which loans were later assumed by BPC, and then reclassified as management fees.

The Plaintiffs demonstrated through Kahaian that substantial amounts were taken out of the Four Entities to pay personal expenses of Brown, his family members and BPC, as well as for loans to Brown's related companies. The Plaintiffs argue that the personal nature of many of these expenditures shows fraud.

The Plaintiffs next showed the various ways that Brown classified and reclassified amounts taken, all of which the Plaintiffs claim reveals Brown's true fraudulent intent. Brown initially booked certain transactions as being loans and expenses. His later recharacterization of loans and expenses into management fees is inconsistent with his assertion that he was entitled all along to management fees. The fact that Brown accomplished a wholesale recharacterization retroactively, going back years, is also suspect. That suspicion is exacerbated by the fact that Brown made the adjusting entries in early 2007, after the downturn in the real estate market was well under way, and just before he informed Lewiston that bank loans were in distress, there were unpaid taxes and trade creditors, and substantial additional capital was needed. The inference that the Plaintiffs draw is that Brown knew he was not entitled to the funds, his diversion of the funds from the Four Entities was about to be discovered, and he needed to cover his tracks.

-28-

Aside from the sheer magnitude of the amounts taken by Brown from the Four Entities, and the circumstances surrounding the manner and reclassification of those amounts, the Plaintiffs argue that fraudulent intent may also be inferred from Brown's concealment of the fact that he had taken these payments out of the Four Entities, and that the Plaintiffs had no knowledge of what Brown had done until after the fact. To establish Brown's concealment, the Plaintiffs rely almost entirely on the testimony of Lewiston, even though there are three other individual plaintiffs. Lewiston testified that he had very little contact with Brown during the years after the Four Entities were formed, and that the contact that he had consisted primarily of social events, generally of a political nature. Lewiston testified that at those events, he did not talk specifics about business with Brown. Although Lewiston acknowledged that he received memoranda (Exhibit 70) from 2001 through 2007 regarding the progress of each of the Four Entities, he testified that those memoranda did not disclose the sums taken out by Brown as loans, reimbursement of expenses or management fees from the Four Entities. Lewiston pointed out that the K-1s he received for each of the Four Entities did not tell him what specific payments, if any, Brown was taking out of the Four Entities as loans, payment of expenses, or management fees. Lewiston testified unequivocally that he did not know that Brown was taking any payments out of the Four Entities as loans, expenses, or management fees.

As additional evidence of the circumstances to show fraud, the Plaintiffs called two other witnesses, one live and one by deposition. Douglas W. Manix testified at the trial. Manix was the president of Campbell Manix Construction Company ("Campbell Manix"), a general contractor and construction manager that was hired in 2004 to build condominiums for Wellesley Building. Subsequently, Campbell Manix was also hired to construct units for Cherry Hill/Denton. Campbell

Manix did not do any work for either Heron Ridge or Tremont Park. Manix testified about the fee arrangement for the vertical construction of units by Campbell Manix, about the construction sites and status of the projects at the time Campbell Manix was first hired, and various other background information regarding the projects. Manix also described the method for submission of a bill for payment and the provision of sworn statements from subcontractors that were paid by Campbell Manix. According to the Plaintiffs, the most important point of Manix's testimony is that some of the work he did was comparable to the work by Brown, but for a much smaller fee. The Plaintiffs believe that the hugely inflated amount charged by Brown for this work is just one other indication of fraud.

The Plaintiffs also introduced into evidence the transcript of a deposition of Terry Nosan (Exhibit 140) taken on August 11, 2010. Nosan is an attorney with extensive experience over 30 years in the development of residential properties. His involvement in this adversary proceeding stems from his relationship with Heron Ridge. Nosan testified that he is an investor in a limited liability company known as FNH Associates, LLC ("FNH"), which was a 25% member in Heron Ridge. Nosan testified regarding his understanding of the terms of the operating agreement for Heron Ridge (Exhibit 2). Nosan acknowledged that section 5.8 of the operating agreement provided for a $2,000.00 developer's fee to be paid to the managing member of Heron Ridge and that section 5.8(b) of the operating agreement provided for an acreage fee in connection with the sale of any of the acreage of the property owned by Heron Ridge. Nosan agreed that other than the developer's fee and acreage fee, there was no specific management fee as such under the operating agreement. The Plaintiffs elicited testimony from Nosan to show that Brown entered into a confidential repurchase agreement with him pursuant to which his interest in Heron Ridge was bought out. The

Plaintiffs argue that the confidential nature of the repurchase agreement suggests that Nosan's interest was bought out by Brown because Nosan had somehow "caught" Brown siphoning off funds before Lewiston did.

To recap, the Plaintiffs' evidence that Brown defrauded the Plaintiffs consists of the amount and manner of the funds taken from the Four Entities, the reclassification of those amounts, and that there was limited disclosure until 2007. Kahaian testified as to the magnitude of the sums taken out by Brown from the Four Entities and the various ways that the funds were taken out, including large personal expenses and loans, and the manner in which these sums were classified and reclassified, sometimes years after the fact. The Plaintiffs established that Brown accomplished much of the transfer of funds through his wholly owned entity, BPC, even though the operating agreements all required unanimous consent for the managing member to enter into a transaction involving an actual or potential conflict of interest. The Plaintiffs also introduced evidence concerning the timing of the retroactive reclassifications in early 2007, after the market had taken a significant downturn and showed no signs of a rebound, and Brown realized he would have to share the bad news that loans were in distress, taxes were overdue, profits were down, and substantial capital infusions were needed. The uncontroverted testimony by Lewiston established that Lewiston did not know that Brown was taking out all of these loans, personal expenses, and management fees over the years. The Plaintiffs also introduced into evidence the operating agreements for the Four Entities which the Plaintiffs argue did not permit Brown to take the personal expenses, loans or management fees that he took.

For his part, Brown did not dispute much of Kahaian's testimony regarding either the amounts that he took from the Four Entities or the manner in which he took them. However, he

strongly disagreed that he was not entitled to take these amounts and strongly disagreed that he failed in any way to disclose the amounts that he took from the Four Entities. Brown acknowledged that the operating agreements (Exhibits 1 through 4) expressly state that members of the Four Entities were prohibited from receiving compensation "for rendering services in their capacity as members." However, Brown explained that he understood that prohibition to apply to the types of activities that limited liability company members typically engage in on account of their status as members, such as attending members' meetings, voting on company matters, or signing loan documents or personal guaranties for the limited liability company. Brown testified that the services that he actually rendered as the managing member are much more extensive and much different than those typical member activities and the costs of his services are, in his view, reasonable expenses incurred by the managing member in connection with the business operations of the Four Entities. As such, these expenses are reimbursable under the operating agreements. In short, the management services that Brown provided were not services provided in his capacity as a member, but instead were reasonable expenses of the managing member incurred in the operation of the business of the Four Entities.

Brown described in detail the services that he performed for the Four Entities during the years 2001 through 2007 as consisting of telephone calls, meetings, inspections, sales, closings and warranty claims. Brown went on to further describe the work he performed in identifying parcels of land; negotiating and structuring purchase agreements; dealing with zoning, utilities and legal issues; obtaining necessary municipal approvals; hiring contractors; spending time daily at the construction sites; dealing with homeowners; handling homeowners' complaints; negotiating with builders on lot sales; and drafting sales documents. Brown described his work week day by day.

Brown admitted that his services were not compensated at an hourly rate, but he testified that they were compensated at a rate that was reasonable based upon his time, effort and expertise. However, Brown testified that there are no documents to evidence the time he spent or the work he performed. Brown stated that he did not keep time records. Also, Brown testified that none of the Four Entities entered into any written contracts with BPC. According to Brown, no contracts were required, but instead all that was required was that Brown, in his sole discretion as the managing member, consider the payments reasonable.

As to the amounts taken, Brown disputed Kahaian's conclusion that BPC received over $7.4 million from the Four Entities, but he did agree that BPC's profit and loss statement as of September 19, 2007 (Exhibit 9) showed a "total management fee" of over $7.2 million. Further, Brown testified that while he did not believe Kahaian's total figure to be correct, he did ultimately acknowledge that BPC received at least $6.5 million during the period from 2001 through 2007 from the Four Entities, and that this sum represented substantially all of the revenue received by BPC during these years. Brown further agreed with Kahaian's testimony that BPC's records reflect that it paid a total of $4.2 million of expenses of all kinds or nature during the years 2001 through 2007. When asked what happened to the balance of the cash that was received by BPC from the Four Entities during these years, Brown testified that the "difference is represented by the time, labor and effort" that he "contributed to the organization." In other words, the difference, according to Brown, represented compensation for his time and labor in managing the Four Entities. Brown testified that each of the operating agreements required him as managing member to devote whatever time and effort was reasonably required to manage the Four Entities and provided him with wide latitude in

-33-

managing the affairs of each of the Four Entities. It was up to him as the managing member to determine what was a reasonable expense for each of the Four Entities.

Brown further testified that if the Four Entities had not paid for his time, effort and expertise as the managing member of the Four Entities, he would have been required to engage third parties to provide those same services for the Four Entities, only at a higher level of compensation. Moreover, if he had hired third parties to perform these services, he believes the third parties would have required payment within 30 days. Instead, the Four Entities benefitted in that they could delay paying Brown until they had the income from sales to do so. Brown testified that his time and labor was not always compensated when earned. Generally, the expense of his time and labor would be reflected at the time he felt it was incurred, and it would be paid when the cash became available. For example, in the early years of Heron Ridge, the development did not generate income. So Brown compensated himself out of revenue generated later. Brown also testified that although his 2006 income tax return showed he received approximately $2 million in income, that income was actually earned over many years. In support of that testimony, Brown described a management fee detail (Exhibit 21) that was prepared to reflect the type and amount of expenses that were reasonable to occur for projects like those of the Four Entities and a reasonable annual management fee for such projects. Although Brown was not clear in his testimony about how the cash he received was broken down by year or by project, he was adamant that the total amount he took, in one way or another, was reasonable in relation to the services he performed as the managing member. Brown was asked why, if he was entitled to management fees, were some management fees changed to cost of goods sold, and others were originally booked as loans or expenses but later changed to management fees.

Brown responded that his controller decided how to record the transactions but, in any event, either of those methods was proper.

Brown disputed Lewiston's testimony that Lewiston did not know of the amounts being taken by Brown from the Four Entities. Brown testified that all of the payments taken were fully recorded and disclosed in the books and records of the Four Entities. Brown testified that he was the person responsible for maintaining the books and records of the Four Entities and for BPC, and that he did maintain them in his office. Various employees of BPC, including the controller Pianko, recorded all transactions in a Quickbooks file for each of the Four Entities and for BPC. Tama's accounting firm came in quarterly to review the Quickbooks records and make adjusting journal entries. According to Brown, Tama and his staff would review the Quickbooks records, identify any expenses that should be recharacterized, and prepare adjusted journal entries on Quickbooks. In support of his testimony, Brown referenced the Tama firm invoices to the Four Entities (Exhibits 41 through 45) that detail extensive services that it provided. Brown identified a number of work papers from Tama's firm (Exhibits 36 through 40) that contain handwritten notes from Tama's staff accountants that Brown believes show that Tama and his staff accountants were well aware of all of the loans, expenses and fees that the Four Entities were paying to Brown and BPC throughout 2001 through 2007. Further, Brown testified that he met frequently with Tama and other staff accountants at Tama's office, including Emil Raab, Mike Finnigan and John Weipert. Brown testified that during those meetings, he discussed the accounting for BPC and the amounts that were being taken out of the Four Entities, and that Tama never indicated to him that the amounts Brown took were excessive.

-35-

Although it was Brown, rather than the Plaintiffs, that primarily emphasized Tama's role as the accountant for the Four Entities and BPC, both Brown and the Plaintiffs seemed to find probative value in what they assert that Tama knew or did not know about the money that Brown was taking from the Four Entities. Curiously, neither the Plaintiffs nor Brown called Tama or anyone from his accounting firm to testify. Instead they stipulated to admit into evidence three separate affidavits signed by Tama, two of which were signed by Tama on February 10, 2009 (Exhibits 33 and 34), and one of which was signed on February 23, 2009 (Exhibit 35). The Plaintiffs argue that these affidavits support their assertion that Brown failed to disclose to the Plaintiffs the payments he was taking from the Four Entities. Brown argues that these affidavits clearly show that Tama, the accountant both for the Four Entities and for Lewiston, was well aware of what was being taken. According to Brown, even if the amounts taken are somehow found to be in breach of the operating agreements for the Four Entities, Brown did not in any way conceal those amounts from Tama or the Plaintiffs and, therefore, there is no basis for the Court to conclude that Brown was acting fraudulently.

Tama's first two affidavits demonstrate that his firm prepared tax returns for the Four Entities and BPC, based upon financial information provided by Brown or Brown's representatives, from the Quickbooks files and other financial information maintained for each entity. In his first affidavit (Exhibit 33), Tama admits that Brown advised Tama or his firm of the amounts taken by Brown as management fees, that Brown gave him or his firm schedules of those fees, and that Tama or his firm used that information in the preparation of tax returns. Although Tama's first affidavit states that neither he nor his firm decided how to characterize the expenses that were reimbursed to Brown or the payment of management fees to Brown, and that his firm did not determine whether

the expenses or management fees taken by Brown were reasonable, the affidavit also states that it is not unusual in Tama's experience to have operating expenses reimbursed and management fees paid to a managing member.

Tama's second affidavit (Exhibit 34) explains that the engagement of Tama's firm was limited to requesting the financial information necessary to enable it to prepare tax returns for the Four Entities and BPC. If the information that Tama received was vague, incomplete or otherwise insufficient, Tama's affidavit explained that Tama would make further inquiry of Brown or Pianko to get the necessary information. According to this second affidavit, there was never an instance when Brown or Pianko refused to answer an inquiry or refused to provide the necessary information. Paragraph 11 of this second affidavit states that Tama and his firm did not undertake a review to determine what was included in the management fees that were taken, and whether they included amounts for overhead, expenses of the managing member, salary for the managing member, or other expenses. However, in the same paragraph, Tama states that in the course of the work his firm has performed over the years for its various clients, Tama is "aware of instances where the category of management fees also includes operating expenses." Paragraph 12 of this second affidavit elaborates that "it is not uncommon for a managing member to be paid management fees, which compensate the managing member for operating expenses, and may also contain a profit amount." Finally, paragraph 13 of Tama's second affidavit explains that during the course of preparing tax returns for the Four Entities and BPC, he became aware that Pianko booked some of Brown's personal expenses to the Four Entities. Upon learning this information, paragraph 13 of Tama's second affidavit states that Tama or someone else at his firm instructed Brown or Pianko that this "did not appear to be appropriate," and Tama believes that any necessary revisions or adjusting

-37-

entries were made in the Quickbooks files. Brown asserts that Tama's affidavits prove that Brown did not conceal any of the payments that were made by the Four Entities.

To further corroborate his claim that he did not conceal any of the sums that he took from the Four Entities, Brown also described his discussions with Lewiston's consultant, Turner, who was brought in by Lewiston in February, 2007 to review all of the financial information regarding the Four Entities. Turner was not called as a witness at the trial, but Turner's file memorandum dated June 12, 2007 (Exhibit 78), which contains a summary of his notes from his meetings with Brown to discuss the Four Entities, was introduced into evidence. That memorandum contains a section entitled "Brown Communities, Affiliates and Related Party Burden/Overhead/Fee Allocation to Projects," which specifically discusses the payment and allocation of expenses and fees among the Four Entities. But it does not either state or imply that Brown in any way concealed any of the amounts that were taken out of the Four Entities, or that there was anything improper about the amounts that Brown took out of the Four Entities or the manner in which these amounts were recorded. Brown also testified without contradiction that Turner never indicated to Brown that he had done anything fraudulent or improper.

To further rebut the Plaintiffs' evidence of fraud, Brown also called two expert witnesses to testify. First, Brown called Mauricio Kohn. Kohn is the owner and manager of Kohn Financial Consulting, an entity that provides various financial advisory services, including valuation of businesses, financial and economic analyses, litigation support services, and forensic accounting. Kohn testified that he was originally retained during the arbitration proceeding between Brown and the Plaintiffs to evaluate the flow of funds in various business entities in which Brown and Lewiston were both involved. Kohn then explained that in this adversary proceeding, he was asked to

quantify the amount of money that was paid by the Four Entities to Brown and BPC, and to evaluate the extent, if any, that this money represented a distribution of a disproportionate share of profits. Kohn testified that he reviewed numerous boxes of records, plus the Quickbooks software files, the accountants' work papers, financial statements, tax returns, correspondence, notes, pleadings, transcripts, general ledgers, trial balances, copies of checks, operating agreement, Kahaian's report, and various other documents and records.

Kohn testified that Brown managed the Four Entities through BPC. Kohn noted that Brown used the Quickbooks accounting software to record expenses paid for by the Four Entities and BPC. Kohn testified that "for the most part," expenses were recorded as either management fees or administrative fees or, in some instances, as development fees. Kohn explained that his job was to ascertain how much money was paid either directly or indirectly to BPC. Kohn testified that he understood that Brown was familiar with the accounting for the Four Entities, but the recording of transactions was handled primarily by Pianko, in consultation with Brown and Tama, and not by Brown. Kohn also noted that Tama had access to the Quickbooks files for the Four Entities.

Kohn testified that he was familiar with the loan accounts maintained by each of the Four Entities. Kohn testified that such loan accounts were very common, and further explained that there was nothing improper about maintaining such accounts. Kohn testified that the loan accounts were generally netted out at the end of the year and then set off against management fees that were owing.

Kohn testified that, based upon his review, he does not believe that Brown "diverted, stole or otherwise improperly took funds from the Four Entities." Kohn explained that the management fees taken out of the Four Entities were "fully disclosed and fully accounted for." Kohn then

testified that the income tax returns for the Four Entities reflected the management fees taken on the line for cost of goods sold. According to Kohn, the capitalization of the management fees as cost of goods sold is consistent with generally accepted accounting principles. When asked if the management fees were "properly accounted for," Kohn answered affirmatively. Kohn went on to testify that the transactions of the Four Entities were "fully disclosed" in the records of the Four Entities. Kohn testified that he did not observe any instances of non-disclosure in any of the books and records of the Four Entities. According to Kohn, "everything was easily identifiable and able to be traced." However, after extensive cross-examination, Kohn reluctantly admitted that the tax returns for the Four Entities, and the K-1s sent to members, do not specifically state whether any management fees were paid out and, if so, in what amounts.

Kohn prepared two written reports. The first report (Exhibit 73) is dated May 14, 2009. It was prepared in connection with Kohn's services in the pre-bankruptcy arbitration proceeding between the Plaintiffs and Brown. However, because that report addressed the flow of funds for more than 28 different entities involving Lewiston and Brown, the vast majority of which are not in any way at issue in this adversary proceeding, the Court considers that report to be irrelevant to this adversary proceeding.

Kohn's second report (Exhibit 74) is dated February 4, 2010 and addresses the flow of funds only with respect to the Four Entities and BPC. Kohn testified that this report contains two basic opinions. The first opinion relates to quantifying the amount of money that the Four Entities paid to BPC, and the second opinion relates to the reasonableness of the amounts paid to BPC. With respect to the first opinion, Kohn testified that he really does not disagree with Kahaian's conclusions about the amount of money being shown as coming out of the Four Entities to Brown.

Kohn agreed that the Quickbooks files "documented" $7.3 million in management fees paid by the Four Entities to BPC. Kohn testified that BPC's records showed receipt of $6,857,030.00 from the Four Entities, and that this sum represented more than 90% of BPC's revenues from 2001 through 2007. The only real difference between Kohn's opinion and Kahaian's opinion regarding the amounts received by BPC from the Four Entities consisted of about $500,000.00 of offsets or credits that Kohn believes were not accounted for by Kahaian. The difference is that Kahaian believes that $7.4 million was received by BPC, while Kohn believes that $6.8 million was received by BPC.

With respect to his second opinion, Kohn testified that, having looked at the books and records of BPC, the amount of profit that BPC showed was $2,086,166.00 without considering the payment of any officer's compensation. Kohn arrived at that figure by looking at all of the revenue received by BPC from 2001 through 2007 and then subtracting from it all of the expenditures made by BPC. Kohn believes that this sum of $2,086,166.00 is still less than the amount "it would have cost to have somebody else provide the services that Brown provided to BPC for the benefit" of the Four Entities. In other words, BPC did not receive enough in profits to adequately compensate BPC as in an "arms' length" relationship. Kohn then testified that he believed the amount of the management fees received by BPC to be reasonable and even less than Brown was entitled to receive.

Kohn's first opinion does not differ significantly from Kahaian's testimony. Both of these two experts basically followed the money trail. Their testimony establishes that the Four Entities paid very substantial sums, approximately $7 million to Brown and BPC during the period from 2001 through 2007. Kohn's testimony, like Kahaian's, supports Brown's contention that all of the amounts paid by the Four Entities were recorded in Quickbooks and could be readily traced. Kohn

went even further by testifying that the manner in which the payments was recorded was both proper and in accordance with generally accepted accounting principles. Because of such disclosure and record keeping, Kohn does not believe there was any diversion of funds or theft by Brown.

Kohn's second opinion was apparently offered in support of Brown's contention that he was entitled to all of the money paid out by the Four Entities and that the aggregate amount was reasonable in relation to the services he provided. However, Kohn's second opinion was based largely on what another expert witness, Andy Milia, had told Kohn, and on a conclusory cost analysis of BPC that was based on the revenue received by BPC. In fact, Kohn admitted that when estimating the amount of a "reasonable" fee for Brown, Kohn did not even consider Brown's performance in managing the Four Entities. Although Kohn's first opinion was probative, Kohn's second opinion lacked foundation and was not persuasive. The Court therefore disregards Kohn's second opinion.

Milia was the last witness called by Brown. Milia is engaged in the real estate land development and consulting business, with many years of experience in land acquisition, commercial development, land development, and property management. Presently he is the sole owner and principal of Franklin Property Corporation, which is a land development company for various entities engaged in the land development business. Milia also owns two other consulting companies, Franklin Consulting, which provides various consulting services, litigation support, and workout services, and Franklin Construction, which acts in a construction management role for other builders and developers on a fee basis. After describing generally the land development business and the land development process, Milia explained that he was engaged in this case to act as an expert witness to provide an opinion regarding the roles and responsibilities of the managing

-42-

member and the other members in the Four Entities, and to render an opinion as to what would be a reasonable amount of fees and expenses for the managing member of the Four Entities under their respective operating agreements. Milia then described a written report that he prepared dated January 22, 2010 (Exhibit 75), which sets forth the various opinions that he has formulated in connection with this case and the basis for them. Because certain of the opinions rendered in the report were found by the Court to call for legal conclusions that Milia was not qualified to give, the Court admitted Exhibit 75, but specifically limited such admission by ruling that the opinions numbered 1 and 5 on page 2 of the report, together with any supporting documentation for those two opinions contained in the report, were excluded from evidence.

The opinions set forth in the portions of Exhibit 75 that were admitted into evidence, as well as Milia's testimony in court, focused on the reasonableness of the management fees and reimbursement of expenses taken by Brown from the Four Entities as the managing member. His opinion on reasonableness was not offered to prove or disprove a breach of the operating agreements, which provided for reimbursement of reasonable expenses, but instead to show that the aggregate funds Brown received from the Four Entities were proportionate to the amount of management fees required for development projects of this size and complexity. Milia testified that the amount of the management fees and the expenses taken by Brown from the Four Entities was both reasonable and consistent with industry practices for properties of the kind developed by the Four Entities. Milia differentiated between expenses incurred by a managing member in the land development process and expenses incurred by a member of a limited liability company for attendance at meetings and other actions required solely by virtue of one's status as a member of a limited liability company. Milia looked at the total of the management fees and reimbursement of

-43-

expenses taken by Brown as the managing member for the Four Entities and compared it to what he described as an objective standard for comparable projects. Milia observed that someone of Brown's experience and skill would ordinarily be entitled to compensation of $300,000.00 to $400,000.00 annually to manage a company like BPC and that a company like BPC would ordinarily receive reimbursement of the expenses it incurred on behalf of the projects that it managed. Ultimately, Milia concluded that the amounts paid to Brown by the Four Entities for reimbursement of expenses and management fees were reasonable in relation to all of the services provided by Brown and in relation to industry practices. He further concluded that it is "unreasonable to assume that the managing member would not get reimbursed for all the expenses and time and labor incurred on behalf of those entities."

Milia also testified concerning the manner in which Brown accounted for the management fees and how Milia discloses such fees for his own projects. In his opinion, the inclusion of management fees and reimbursement of expenses, along with engineering fees and other development costs, in the line for costs of goods sold on the tax returns of the Four Entities is not atypical. However, Milia acknowledged that the line for costs of goods sold did not by itself contain a breakdown that would enable a reader of the tax returns to ascertain how much was taken out as a management fee or for reimbursement of expenses for the managing member. Milia testified that in his own projects, he typically sends a K-1 and only sends the entire tax return to the members when requested to do so. If members have questions about the information in the tax return, such as the breakdown for the cost of goods sold line item, Milia explained that he sends a full report of the Quickbooks records.

-44-

On cross examination, Milia was shown a tax return for Wellesley Building (Exhibit 22), that showed over $14 million on the line item for costs of goods sold. Milia acknowledged that there is no way for a reader of that tax return to determine how much of that costs of goods sold consisted of management fees and expenses. Nor could a reader determine how much of that sum was paid to Brown or BPC. Milia further acknowledged on cross examination that a number of the operating agreements attached to his report (Exhibit 75), to which he or his company is a party, contain express provisions for payment of fees, unlike the operating agreements for the Four Entities (Exhibits 1 through 4). Nonetheless, Milia still insisted that in his opinion, the management fees and expenses taken by Brown from the Four Entities were reasonable and consistent with industry practice for projects of that kind and for services provided by a managing member with the skill level and experience of someone like Brown. Finally, Milia agreed that he had not conducted any investigation to determine whether any particular payments made to Brown were for expenses actually related to the Four Entities, but instead only looked at the overall amounts of expenses and management fees to determine whether they were reasonable for management of the Four Entities.

In sum, Brown insisted that even though the amounts taken out of the Four Entities from 2001 through 2007 were substantial, and even though the payments were booked variously as loans, payment of expenses or management fees, and then subsequently reclassified, all of them were earned through his significant labor, he was entitled to the fees under the operating agreements, and they were fully and properly recorded in the Four Entities' Quickbooks accounting files. According to Brown, all of the information regarding these payments was fully and contemporaneously recorded, was readily available at all times, was not concealed from any of the Plaintiffs, and neither

-45-

Tama, Lewiston's accountant, nor Turner, Lewiston's consultant, ever found that Brown did anything improper.

Like many fraud cases, the Plaintiffs' proofs in this adversary proceeding are largely circumstantial. The Plaintiffs do not identify any specific statement by Brown regarding the amounts taken from the Four Entities that was false, nor any specific act or omission that was fraudulent. Instead, the Plaintiffs rely heavily on the evidence that shows Brown taking out very large sums of money from the Four Entities in various ways over the years 2001 through 2007, including through a wholly owned company that had no written contractual relationship with any of the Four Entities or their managing members, without ever specifically informing the Plaintiffs that these sums were being taken and, according to the Plaintiffs, in violation of the terms and provisions of the operating agreements for the Four Entities. In addition, the use of the payments for personal expenses and loans to related parties, coupled with the subsequent reclassification of these amounts as loans assumed by BPC, the conversion of these amounts into management fees for Brown, and the timing of those adjustments, demonstrate a fraudulent intent on the part of Brown. The Court agrees that there are aspects of Brown's conduct that suggest that he perpetrated a fraud.

However, while there are some facts that suggest Brown's conduct was fraudulent, there are also other facts that suggest that he did not intend to deceive the Plaintiffs, and that the dispute in this adversary proceeding is more in the nature of a breach of contract dispute than the result of fraud. All of the evidence indicates that Brown contemporaneously recorded the amount, date and payee of each transaction in the Quickbooks files for each of the Four Entities and did not take any steps to try to conceal it. There is no evidence that he hid any of this information either from the Tama accounting firm or from Turner, the consultant brought in by Lewiston in early 2007 to

-46-

investigate the condition of the Four Entities. Even the Plaintiffs' own expert witness, Kahaian, a certified fraud examiner, admitted that in his review, he did not come across any information that showed that any of the transactions performed by Brown were not fully disclosed in the Quickbooks files, or that they were in any way hidden by Brown in the Quickbooks records or from Tama's accounting firm. Although Kahaian testified in depth regarding the amounts, the manner in which Brown took the funds, and Brown's use of those funds, he specifically acknowledged that he did not have an opinion as to whether Brown was entitled to payment of any management fees or expenses by the Four Entities. He further stated that he did not have an opinion as to the reasonableness of any of the amounts that were paid. Rather, Kahaian clearly explained that his engagement was limited to following the money, determining the amounts that were taken out, and tracing their disposition. Importantly, he specifically stated that he wanted to "make sure it's clear" that he did not conduct a "fraud analysis." Kahaian did not testify that he had an expert opinion that Brown had perpetrated a fraud, even though Kahaian is certified as a fraud examiner. Kahaian's testimony, which was corroborated by Kohn, left the Court with the strong impression that all of the payments from the Four Entities were easy to trace and that no one had taken any steps to hide them.

Further, the Plaintiffs did not introduce any evidence that Brown ever made a misstatement to any of the Plaintiffs regarding what he was taking out of the Four Entities. The memoranda that were introduced into evidence (Exhibit 70) that were distributed by Brown to the Plaintiffs and members of the Four Entities do not make any false statements about loans, expenses, management fees or other sums taken out of the Four Entities. Nor did Plaintiffs introduce any testimony of even a single conversation that any of them ever had with Brown in which he indicated in any way he was not taking out loans, expenses or management fees from the Four Entities.

-47-

Tama's affidavits likewise do not show any deception by Brown. Tama appears to carefully walk a tightrope between two clients – Lewiston and Brown. Whatever other probative value his affidavits may have, if any, they do not tend to show that Brown was concealing in any way the substantial sums that he was taking from the Four Entities whether as loans, reimbursement of expenses or management fees. The Court is not willing to go so far as Brown urges, and find that all of Tama's knowledge is imputed to Lewiston simply because Tama was also Lewiston's accountant. However, a salient point does emerge from Tama's affidavits: this is not a case of a debtor that hid bank accounts, or kept a second set of books and records, or falsified entries in the Quickbooks files to cover up what he was taking, or failed to report on his individual tax returns the amounts he was taking. A fair reading of Tama's affidavits, much like Kahaian's and Kohn's testimony, is that all of the information regarding payments to Brown was fully recorded in the books and records of the Four Entities and that Tama, the accountant for the Four Entities, although disavowing any role in determining whether these amounts could be taken out or whether they were reasonable, was certainly aware of these amounts at the time they were taken out, and was well aware of how they were being recorded on the books and records of the Four Entities and BPC. The detailed information about the payments to Brown, fully and contemporaneously recorded in the Quickbooks files, known to Tama and readily traceable by Kahaian and Kohn, does not indicate deception by Brown.

Moreover, there was substantial testimony from Brown and from his expert witness Milia, that the amounts taken, in the aggregate, even though initially classified as payments of personal expenses and loans to related entities, nonetheless do not exceed the amounts that would ordinarily be taken and considered reasonable for expenses and fees for the management of projects of the size

-48-

and scope of the Four Entities. There is no testimony in the record at all to contradict Brown's and Milia's assertion that the amounts taken out ultimately did not exceed amounts that are within the range of reasonableness for projects of the type and scope of the Four Entities. Although the Plaintiffs contest Brown's contractual entitlement to any loans, expenses, or management fees under the operating agreements, and contest the reasonableness of the amounts taken, in whatever form, that dispute is more in the nature of a contract dispute under the operating agreements, rather than a dispute regarding fraud.

Although the Plaintiffs introduced extensive testimony and voluminous documents into the record, much of their evidence had little or no probative value in demonstrating whether Brown perpetrated a fraud. For example, one of the Plaintiffs' witnesses, Manix, impressed the Court as credible. Manix testified that he knew Brown, was hired by Brown, and described certain of Brown's activities concerning the two projects that Campbell Manix worked on. But Manix was neither asked about nor testified to the relationship and communications between the Plaintiffs, on the one hand, and Brown, on the other hand. What emerged from Manix's testimony is that Campbell Manix performed substantial vertical construction activities on two of the projects owned by the Four Entities, the relationship eventually terminated for nonpayment, and ended up in litigation. But that testimony does not tend to prove that Brown defrauded the Plaintiffs.

The same can be said about Nosan. Nosan testified that the project developed by Heron Ridge was a large and difficult development. Nosan testified that Brown managed the day to day operations of Heron Ridge and put in significant amounts of time in the management of this project. Nosan testified that he knew Brown because of a prior relationship in the residential building business, and described Brown as somebody he respected. When asked about information that he

-49-

09-05276-pjs   Doc 146   Filed 01/03/11   Entered 01/04/11 08:09:19   Page 49 of 60

received concerning Heron Ridge, Nosan testified that he received K-1s, and would then ask for tax returns which were provided to him by Brown. He also testified that he received reports on sales, loan balances, development costs to date, and "things of that nature." Nosan did not testify that he had any complaints with respect to either Brown's management of Heron Ridge or the reporting that Brown provided regarding Heron Ridge. Nosan agreed that section 5.9 of the operating agreement permitted the managing member to obtain reimbursement for all reasonable expenses incurred in connection with the operation of Heron Ridge's business. Nosan testified as to his familiarity with other operating agreements and offered some opinions about the different ways to structure management fees or reimbursement of expenses for managing members in connection with operating agreements like the Heron Ridge agreement. Ultimately, Nosan testified that the $2,000.00 developer's fee was on the "low side" if it was intended to be an "all inclusive" fee for management of the Heron Ridge project. Nosan followed that up by stating that his personal preference is to have management fees structured as "all inclusive," and avoid language like "reimbursements for reasonable expenses," but he seemed to recognize that the operating agreement for Heron Ridge provided both for the developer's fee and for the managing member to receive reimbursement for reasonable expenses.

Nosan's testimony is at best inconclusive. On the one hand, he acknowledges that the only fee provided for the managing member in the Heron Ridge operating agreement is the developer's fee (plus the acreage fee upon sale of a parcel). The developer's fee, according to Nosan, was low. On the other hand, Nosan admits that the operating agreement for Heron Ridge also contained a provision for reimbursement of reasonable expenses for the managing member. Nosan did not indicate one way or the other whether the expenses that were allegedly reimbursed by Heron Ridge

to Brown were reasonable or not. However, he did say that in incurring expenses in the operation of the business, the managing member "has a lot of discretion," including discretion to decide whether to "out source things or do them themselves." Nosan recognized that the decisions made by the managing member in this regard "could substantially impact the bottom line," but he did not express any view as to whether the expenses incurred by Brown as the managing member of Heron Ridge were reasonable or not. Nosan's testimony does not tend to prove that Brown perpetrated a fraud upon the Plaintiffs.

In the Court's view, it is significant that none of the Plaintiffs testified in this adversary proceeding other than Lewiston. Therefore, there is no evidence in the record regarding how those other Plaintiffs were in any way defrauded nor how they may in any way have been misled by Brown or by any information provided to them by Brown regarding the Four Entities. The record in this case is devoid of any evidence to show what any of the other Plaintiffs, Jason Lewiston, Leslie Lewiston Etterbeek or Daniel Smith, may have known or not known about the payments that Brown was taking as the managing member of the Four Entities. Lewiston did testify extensively. He impressed the Court as extremely knowledgeable and experienced in the development and building of residential real estate. He also impressed the Court as credible. However, he did not identify a single statement that Brown made to him regarding any money that was taken out that was untrue, nor did he identify any specific conduct of Brown regarding the amounts taken that somehow deceived him. Further, he testified that he did not ask Brown whether he had taken any payments out of the Four Entities until February, 2007. Lewiston's assertion that Brown perpetrated a fraud is based largely on what Lewiston now says that Brown did not tell him about the Four Entities from 2001 through 2007. But Lewiston does not dispute that all of the information regarding payments

-51-

made by the Four Entities to Brown was fully and contemporaneously recorded in the Quickbooks files maintained by each of the Four Entities, and that the Quickbooks files were at all times accessible and were reviewed quarterly by the Tama accounting firm. Lewiston testified credibly that he personally did not know of the management fees, payment of expenses and other sums of money being taken out of the Four Entities by Brown, and was genuinely shocked when he finally realized the full extent of the amount paid. The Court believes him. But that does not by itself prove fraud.

On balance, after carefully weighing all of the evidence in this case, the Court finds that the Plaintiffs did not meet their burden to prove, by a preponderance of the evidence, that Brown engaged in deceptive conduct with the intent to defraud the Plaintiffs. The evidence may well support a claim against Brown for breach of the operating agreements of the Four Entities. But there is not sufficient evidence in the record to prove actual fraud.

In addition to failing to prove deceptive conduct by Brown, the Plaintiffs also failed to prove a second required element under § 523(a)(2)(A). As noted earlier, under Field v. Mans, 516 U.S. at 74-75, a second, essential element of an action for actual fraud under § 523(a)(2)(A) is a showing of justifiable reliance. A plaintiff must make an investigation "where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived . . . ." Id. at 71 (internal quotation marks and citation omitted).

The Plaintiffs did not introduce any evidence to show that there was justifiable reliance by any of them other than Lewiston. There simply is nothing in the record for the Court to make any findings regarding justifiable reliance by any of the Plaintiffs other than Lewiston. As for Lewiston,

the evidence establishes that he is a well-educated, sophisticated, knowledgeable and experienced developer and investor in real estate projects. He has acted in many capacities in the real estate development field since 1964. The Court accepts as true his statement that Brown never told him directly what payments Brown was taking out of the Four Entities. But the evidence also establishes that the operating agreements gave the managing member wide latitude in the payment of expenses and in the management of the financial affairs of the Four Entities. Each of the operating agreements for the Four Entities named Wittlesey, Wellesley Equities and J&J Management as the managing members. Lewiston's son, Jason Lewiston, was co-owner along with Brown, of Wellesley Equities and J&J Management. The evidence establishes that Jason Lewiston's day to day involvement as a managing member stopped after 2002. The evidence also establishes that, despite the fact that the operating agreements named specific entities as the managing members, it was Brown who worked full time as the sole managing member of each of the Four Entities since at least 2002. Lewiston did not testify that Brown's total control as the de facto managing member was unknown to him. Nor did he testify that either he or any of the other Plaintiffs ever objected to such control. The clear inference from these circumstances is that Lewiston knew and approved of Brown's absolute command over the Four Entities.

Given that knowledge, and Lewiston's education and experience in real estate development, what did he do? Lewiston testified that he received most of his information about the progress of the projects from Brown's memoranda. Lewiston did not even regularly communicate with Jason Lewiston about the projects. Lewiston testified that he received the K-1s and turned them over to his accountant without discussing them. Lewiston did not testify that he asked for copies of the income tax returns for the Four Entities, or for any other information. Lewiston never asked to see

the Quickbooks files for the Four Entities from 2001 through 2007. Lewiston testified that the first time he asked any questions about the financial condition of the Four Entities was after he received the February 6, 2007 memorandum from Brown. And only after that did he take action, by hiring Turner as a consultant. Even the most cursory examination of the records of the Four Entities, or a discussion with Tama, his own accountant, or an investigation of any kind, would have revealed to Lewiston all of the payments that Brown was taking from the Four Entities. Based on the evidence in the record, the Court finds that the Plaintiffs failed to prove that Lewiston or any of the Plaintiffs justifiably relied on any alleged fraudulent conduct by Brown.

The final element in proving actual fraud under § 523(a)(2)(A) is proximate cause. "There must be a direct link between the alleged fraud and the creation of the debt." WebMD Practice Services, Inc. v. Sedlacek (In re Sedlacek), 327 B.R. 872, 888 (Bankr. E.D. Tenn. 2005) (alterations, internal quotation marks and citations omitted).

With the multiple entities and layers of ownership, the Plaintiffs were not precise in articulating to whom Brown owed a debt. Similarly, the partial summary judgments entered in the Oakland County Circuit Court arbitration do not clearly indicate in whose favor the partial summary judgments were rendered. Although the Plaintiffs collectively argue that their claims against Brown are direct claims, and not derivative of any claims that the Four Entities may have against Brown, the Plaintiffs' proofs did not focus on how Brown's conduct caused the creation of the Plaintiffs' claims. However, because the Court has already held that the Plaintiffs have failed to prove by a preponderance of evidence either of the first two elements of § 523(a)(2)(A) – that there was an actual fraud and that there was justifiable reliance – the Court concludes that it is unnecessary to make any findings regarding proximate cause of the Plaintiffs' claims.

-54-

To be sure, the Court does not make any finding that Brown was entitled to take the funds out of the Four Entities, either in the amounts that were taken, or the manner in which they were taken. Nor does the Court in any way condone the accounting treatment employed by Brown as the managing member of the Four Entities. However, in the final analysis, after carefully reviewing all of the evidence in the record, the Court is simply not persuaded that the Plaintiffs have met their burden to prove by a preponderance of the evidence a non-dischargeable debt based upon actual fraud under § 523(a)(2)(A).

### Section 523(a)(4)

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The Plaintiffs allege embezzlement.

> "Federal law defines 'embezzlement' under § 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicated fraud."

Morganroth & Morganroth, PLLC v. Stollman (In re Stollman), 404 B.R. 244, 271 (Bankr. E.D. Mich. 2009) (quoting Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73 (6th Cir. 1996)); see also Kitchen v. Boyd (In re Newpower), 233 F.3d 922, 930 (6th Cir. 2000) ("[T]he offense of embezzlement involves the fraudulent appropriation of property of which the embezzler is rightfully in possession[.]") (citations omitted); McMahon v. Politte (In re Politte), 2007 WL 4556689 at *2 (Bankr. W.D. Ark., Dec. 19, 2007) (ruling that embezzlement under § 523(a)(4) requires that a debtor must have "appropriated funds for his own benefit, and has done so with fraudulent intent or by deceit") (internal quotation marks and citation omitted).

-55-

The Plaintiffs did not ever clarify the first element of embezzlement, i.e. exactly what property of *theirs* was entrusted to Brown. There was evidence that the Plaintiffs had made capital contributions. The record shows that Stoneleigh invested $425,000.00 in Heron Ridge, that JGR invested $1,250,000.00 in Tremont Park, and Lewiston invested $300,000.00 in Wellesley Building. But there is no evidence in the record to show that the funds taken by Brown from any of the Four Entities were taken from any of those investments. All of those capital contributions were made, according to the operating agreements, in the years 1997 through 2000. But Kahaian's reports (Exhibits 138 and 139) show that the funds taken out by Brown were primarily taken out during the years 2002 through 2007, with the vast majority of the funds taken out in the years 2005 and 2006. Moreover, the funds taken out by Brown were far in excess of the amounts of any capital contributions made by any of the Plaintiffs. In other words, even assuming that Brown was taking out substantial sums from the Four Entities in violation of the operating agreements, there is no proof that those funds were coming out of any capital contributions or other funds entrusted by the Plaintiffs to Brown. Instead, based upon the amounts and the timing of the payments, the funds taken out of the Four Entities by Brown appear to have come from the operating income generated by the Four Entities through sales of lots and condominiums. It is not entirely clear to the Court that the Plaintiffs are arguing that the taking of funds out of the operating income of the Four Entities constitutes embezzlement of *their* property, rather than embezzlement of property that belonged to the Four Entities. But even assuming that the operating income of the Four Entities that lawfully came into Brown's hands constitutes the embezzled property, there are still other elements that must be shown to prove embezzlement.

There was substantial evidence that Brown used funds from the Four Entities, and used them in ways that the Plaintiffs believe to be in violation of the operating agreements for the Four Entities. But the Plaintiffs simply did not prove that Brown took the funds out of the Four Entities with fraudulent intent. The circumstances that the Plaintiffs rely upon to show fraudulent intent for purposes of proving embezzlement under § 523(a)(4) are the same circumstances that the Plaintiffs rely upon to show actual fraud for purposes of § 523(a)(2)(A). After listening to all of the testimony, and reviewing all of the documentary evidence, for the reasons explained in the section of this opinion addressing § 523(a)(2)(A), the Court finds that the Plaintiffs have failed to prove by a preponderance of the evidence that Brown had a fraudulent intent, which is a requisite element of embezzlement under § 523(a)(4).

### Section 523(a)(6)

Under § 523(a)(6), a debt "for a willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable. "Willful" means that a debtor must "intend the consequences of an act," Kawaauhua v. Geiger, 523 U.S. 57, 61-62 (1998), or "believe[ ] that the consequences are substantially certain to result . . . ." Kennedy v. Mustaine (In re Kennedy), 249 F.3d 576, 580 (6th Cir. 2001) (citations omitted).

"Malice" for purposes of § 523(a)(6) means "without just cause or excuse." Tinker v. Colwell, 193 U.S. 473, 485-86 (1904) (internal quotation marks and citation omitted). Alternately, malice has been defined as "act[ing] in conscious disregard of [one's] duties . . . ." Qui v. Zhou (In re Zhou), 331 B.R. 274, 277 (Bankr. E.D. Mich. 2005) (citing Gonzalez v. Moffitt (In re Moffitt), 252 B.R. 916, 923 (B.A.P. 6th Cir. 2000) and Monsanto Co. v. Trantham (In re Trantham), 304 B.R. 298, 308 (B.A.P. 6th Cir. 2004)).

The evidence does show that Brown caused substantial funds to be paid by the Four Entities for his personal use and the use of his family members and related entities. The Plaintiffs introduced substantial evidence to show that the funds taken by Brown from the Four Entities may have violated the terms of the operating agreements. Without question, the funds taken by Brown from the Four Entities were substantial, and they enabled Brown and his family to live a lavish lifestyle. But actions that are calculated to benefit a debtor, with any harm to a plaintiff being a result of the debtor's "reckless disregard for [the plaintiff's] economic interests," are not malicious for purposes of § 523(a)(6). McMahon v. Politte (In re Politte), 2007 B.R. 4556689 at *5 (Bankr. W.D. Ark. Dec. 19, 2007). "[O]nly acts done with the intent to cause injury - and not merely acts done intentionally - rise to the level of willful and malicious injury for purposes of satisfying § 523(a)(6)." Kennedy v. Mustaine, 249 F.3d at 581 (citing Geiger, 523 U.S. at 61 and Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (1999)).

After considering all of the evidence in the record, the Court is not persuaded that Brown intended by taking funds from the Four Entities as loans, expenses or fees, to cause any injury to the Plaintiffs. Instead, the evidence establishes that Brown's intent was that all of the projects would be profitable and that the members of the Four Entities would share in their eventual success, and that Brown was taking what he believed that he was entitled to receive as the managing member under the operating agreements for the Four Entities. Brown's belief may have been erroneous, and his conduct may have violated the operating agreements, resulting in injury to the Four Entities and the Plaintiffs. But the evidence does not demonstrate that Brown either intended an injury to the Plaintiffs, or knew that his conduct was substantially certain to cause injury to the Plaintiffs. The Plaintiffs may have proven that Brown breached one or more of the provisions of the operating

-58-

agreements. But they failed to prove by a preponderance of the evidence the requisite willfulness to prove a non-dischargeable debt under § 523(a)(6).

## <u>Conclusion</u>

After reviewing and weighing all of the evidence, the Court is left with the impression that Brown actually believed that he had the discretion as the de facto managing member of the Four Entities to take out the large amounts that he did, and believed that the manner in which he took these payments (i.e., loans, payment of personal bills, etc.) was permissible and within such discretion. The Court does not share Brown's beliefs. Indeed, the payment of lavish personal expenses in this manner, rather than payment of more conventional means of compensation, can constitute a badge of fraud. Moreover, the sense of entitlement that Brown sometimes displayed during his testimony regarding his perceived unlimited discretion to make such payments is disturbing. Further, from the Court's observations at trial, Brown was at times evasive, and was not always forthcoming. However, on balance, after considering all of the evidence, the record made in this case does not demonstrate sufficient circumstances to prove fraud, embezzlement, or willful and malicious injury. Instead, the record made boils this case down to a contract dispute between two very sophisticated and experienced real estate developers over the interpretation of the provisions in the operating agreements for the Four Entities, and over the management of the Four Entities, which only came to a head after some of the projects failed. The Court is just not persuaded that the evidence in this record proves that Brown defrauded the Plaintiffs. Brown certainly had a different view of what he was permitted to do under the operating agreements than Lewiston may have had, and Brown's view is not one to which the Court subscribes. However, the issue here isn't whether Brown breached the operating agreements, either by the manner in which he took the funds

-59-

or the amounts that he took, but rather whether the Plaintiffs have met their burden to prove by a preponderance of the evidence that there is a non-dischargeable debt under one of the statutory exceptions to discharge contained in § 523 of the Bankruptcy Code. The Plaintiffs make persuasive arguments that what Brown did was not reasonable or permissible under the operating agreements. But that does not make a non-dischargeable debt. After carefully reviewing the thousands of pages of exhibits (including those exhibits not specifically referenced during the trial), and the numerous days of testimonial evidence, weighing all of this evidence, and considering all of the circumstances of the case, the Court holds that the Plaintiffs did not meet their burden to prove that their alleged debts are non-dischargeable under §§ 523(a)(2)(A), (4) or (6).

The Court will enter a separate order, dismissing the Plaintiffs' complaint, for the reasons set forth in this opinion.


Signed on January 03, 2011

                                     /s/ Phillip J. Shefferly
                              Phillip J. Shefferly
                              United States Bankruptcy Judge